IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

DANIEL R. CARTER, )
)
   Plaintiff, ) TC-MD 130198C
)
  v. )
)
MARION COUNTY ASSESSOR, )
)
   Defendant. ) **FINAL DECISION**

## I. INTRODUCTION

The court entered its Decision in the above-entitled matter on January 3, 2014. The court

did not receive a request for an award of costs and disbursements (TCR-MD 19) within 14 days

after its Decision was entered. The court's Final Decision incorporates its Decision without

change.

Plaintiff timely appealed from orders of the Marion County Board of Property Tax

Appeals (Board) sustaining the real market values on the assessment and tax rolls of 21

residential duplexes for the 2012-13 tax year.[1]

Trial was held in the courtroom of the Oregon Tax Court on October 9, 2013. Plaintiff

was represented by W. Scott Phinney, Prime Property Tax Negotiation. Defendant was

represented by Scott A. Norris, Assistant County Counsel, Marion County. Testifying for

Plaintiff were Mona St. Clair (St. Clair), a real estate associate working as an independent

contractor with Keller Williams Realty, Portland, Oregon, and Rick M. Bean (Bean), Broker,

---

[1] The parties list the duplex account numbers in different orders in their respective exhibits (Ptf's Ex 1 at 98, 100; Def's Ex A at 2), but they agree on the 21 property tax account numbers. They are as follows: R92567, R92565, R92571, R92572, R92573, R92574, R92575, R92570, R92558, R92557, R92555, R92569, R92568, R92566, R92564, R92563, R92562, R92561, R92560, R92559, R92556. (*Id.*) The first 11 account numbers are all 1584 square foot duplexes (total area for both units within the duplex), and the final 10 accounts are 2,032 square feet in size. (*Id.*)

Rose City Commercial Real Estate.  The court heard brief testimony about the witnesses' professional credentials, and reviewed more comprehensive information about the witnesses submitted by Plaintiff.  The court concludes that St. Clair is knowledgeable in real estate matters, including valuation, and that Bean qualifies as an expert in that area.[2]

Testifying for Defendant were Robb Witters (Witters), Senior Appraiser, Marion County Assessor's Office, and Nathaniel Combs (Combs), Senior Commercial Property Appraiser, Marion County Assessor's Office.   The court also heard testimony about Defendant's witnesses' professional credentials, and reviewed more comprehensive information submitted by Defendant regarding Witters, and concludes that both Witters and Combs are qualified experts in property valuation techniques and methodologies.[3]

Turning to the documentary evidence offered at trial, Plaintiff's Exhibits 1 and 3 were admitted without objection.  Defendant's Exhibits A through D were admitted at trial, Exhibits A, B and D being admitted over Plaintiff's objections.

---

[2] St. Clair testified that she is a realtor specializing in residential property, and is an independent contractor with Keller Williams Realty.  Bean testified briefly to his credentials, noting that he was a real estate broker with multistate experience in real estate sales, that he also has a "blog," and will soon have a "radio show."  Plaintiff submitted a form of resume as part of its Exhibit 1 that more fully describes Bean's real estate experience, including the fact that he has "29 years [of] business experience [and] five years in investment real estate."  (Ptf's Ex 1 at 136.)  Bean's resume describes him as a specialist in "on-site and electronic market research [in Oregon, Nevada, Arizona, and New Mexico]," and lists five real estate associations/certifications Bean has obtained, plus 30 hours of classroom training on the income approach to valuation.  (Id.)

[3] Defendant submitted a document that amounts to either a resume or curriculum vitae. (Def's Ex A at 17.) That document indicates that Witters is a Senior Appraiser in the Residential Section of the Assessor's office, with an associate of arts degree from Chemeketa Community College in 2011 and "[o]ver 150 hours of appraisal classes to obtain and maintain [his] appraisal license and certification." (Id.)  That document further indicates that Witters was involved in nine continuing education classes presented by the Oregon Department of Revenue between June 2008 and August 2012, and that his appraisal experience began in 2004, with Witters working as an Appraiser Assistant between 2004 and 2006, followed by experienced as a licensed appraiser from 2006 through 2008, and a certified appraiser from 2008 to present. (Id.)  Witters assumed his present role as senior residential property appraiser in 2009. (Id.)  It appears from Plaintiff's cross-examination of Witters that Witters was a private appraiser from 2004 to 2008, and left the private industry for the public sector in 2008 because of the economic downturn in the real estate market.  There is less information on Combs' professional experience. Combs, who was called by Defendant as a rebuttal witness, did testify under oath that he was a Senior Commercial Appraiser with the Assessor's office, where he has worked for the past five years, and that he has been in his current position for about seven months.

## II.  STATEMENT OF FACTS

A.      *Property overview*

This appeal involves the real market value (RMV) of 21 individual duplexes properties, each located on their own tax lot, in the Stonecreek Subdivision in Northeast Salem near McKay High School.  (Ptf's Ex 1 at 1-3; Def's Ex A at i, 1, 9.)  All 21 duplexes were built in 1979 and are held under common ownership.  (Ptf's Ex 1 at 21; Def's Ex A at 16.)  They are all in the same neighborhood and are essentially contiguous to one another.  Seventeen of the 21 properties are located on Phipps Circle, which forms a looped neighborhood off Phipps Street; the other four duplexes are located on Phipps Street, directly across from the Phipps Circle looped neighborhood block where the 17 subject duplexes are located.  (Def's Ex A at 9.)  The properties are all zoned RD (duplex residential).  (*Id*. at 1; Ptf's Ex 1 at 23.[4])  Although there was some initial reluctance by Defendant's witnesses to acknowledge the poor quality of the neighborhood where the subject properties are located, both sides ultimately agreed that the subject duplexes are in a "bad" neighborhood, a factor emphasized considerably more by Plaintiff than Defendant.  Plaintiff presented considerable persuasive evidence on the quality of the area where the properties are located, both through the testimony of St. Clair and certain supporting documentary evidence included in Plaintiff's Exhibit 1 related to various violent and non-violent crime statistics, including auto theft, sexual assault and illegal drug arrests.

St. Clair testified that the area where the subject duplexes are located suffers from a high crime rate and is comprised of individuals in the lower socioeconomic class.  St. Clair testified that while the quality of many of the subject units was "fine," in her professional opinion location in this case is the most dominant factor affecting value and the high crime rate

---

[4] Plaintiff's Exhibit 1, apparently authored primarily by Bean, indicates that the "current zoning of the property is RM2," but being corrected at trial, Bean testified that the zoning was in fact RD.

negatively impacts the properties' values. Bean agreed that the area was a "bad" neighborhood with an "active crack house" located nearby to the south of the subject. Plaintiff also included statistics on crime, reported in terms of the national median crimes per square mile, and the figures for the state of Oregon, the city of Salem, and the Oak Park neighborhood, the latter of which is where the 21 subject duplexes are located. (Ptf's Ex 1 at 42.) According to the evidence, the national crime rate is 39.6 crimes per square mile; the rate for the state is 11, for Salem the reported crime rate is 134, and for Oak Park that rate is nearly twice the rate for Salem at 209 crimes per square mile. (*Id*.)

Because the properties are all duplexes, there are two living units per building for a total of 42 units. The duplexes are all managed as rentals. The parties agree on the size of the units, but describe them slightly differently. Defendant's appraiser Witters indicates in his appraisal report that "all duplexes * * * are one of two designs." (Def's Ex A at 1.) Witters explains that the first design consists of two 792 square-foot "mirror image[]" units, each unit having two bedrooms and one bathroom. (Def's Ex A at 1.) Bean agreed with that description, testifying at trial that the two-bedroom, one-bathroom units were 792 square feet in size. (*See also* Ptf's Ex 1 at 2.[5]) There are 11 of those duplex models. (Ptf's Ex 1 at 2, 98.[6]) Witters explains in his report that "[e]ach unit has a wood burning fireplace and an attached single car garage." (Def's Ex A at 1.)

The other duplex design "consists of one unit which is 1,128 square feet and has three bedroom[s] and one and one half bathrooms [with] [t]he second unit [being] 904 square feet [in

---

[5] That exhibit indicates that there are duplexes with 1584 square feet of living space, which means that each unit is 792 square feet. (Ptf's Ex 1 at 2.) That exhibit also indicates that the "unit mix" is "2-1/2-1," meaning two bedrooms, one bathroom. (*Id*.)

[6] St. Clair's Opinion of Value lists 11 units as having a total living area of 1,584 square feet, which, if divided by two, equals 792 square feet. (Ptf's Ex 1 at 98.) Her report also identifies the "unit mix" as "2-1/2-1," which the court assumes means two bedrooms, one bath, the same description appearing in Witter's appraisal.

size with] two bedrooms and one bathroom." (Def's Ex A at 1.) There are 10 of those units, all of which also have attached garages but, unlike the other smaller duplex units, have concrete patios. (Ptf's Ex 1 at 100; Testimony of Bean.) Bean agreed at trial with Witters' duplex description, testifying that there were 904 square-foot units with two bedrooms and one bath, and units that were 1128 square feet in size with three bedrooms and one and one-half bathrooms.

Concerning the 21 duplexes at issue, the 11 smaller mirror image duplexes have 1,584 square feet of living space (792 square feet per unit) and the other 10 have 2,032 square feet of living space (the mixed duplexes, with one unit having 1,182 square feet of living space and the other 904 square feet). (Def's Ex A at 2; Ptf's Ex 1 at 98, 100.) The 21 duplexes are located on lots ranging in size from a minimum of 7020 square feet to a maximum of 11,400 square feet. (Def's Ex A at 2.)

B.    *Plaintiff's evidence*

Plaintiff presented its case on the testimony of two witnesses. The first, St. Clair, provided a value range for each of the two types of duplex units: one for the smaller duplex units, which are 1,584 square feet in size, and the larger units, which are 2,032 square feet in size, with one unit in each of those duplexes having two bedrooms and one bathroom and the other type having three bedrooms and one and one-half bathrooms. (Ptf's Ex 1 at 97-101.) St. Clair valued the duplexes based on the sale of 11 comparable duplex properties built between 1942 and 1997 situated on lots ranging in size from 6,970 square feet to 19,166 square feet. (*Id.* at 101) The subject duplexes were built in 1979 and sit on lots ranging from 7,020 square feet up to 11,407 square feet. (*Id.* at 98, 100; Def's Ex A at 1.)

St. Clair's comparables sold between March 2011 and June 2013 for prices ranging from a low of $32,000 for a 1,560 square-foot duplex on a lot similar in size to the subject duplexes

(9,583 square feet) which sold on October 29, 2012 (comparable #9), to a high of $129,900 for a larger 1,910 square-foot duplex on an 8,276 square-foot lot which sold November 13, 2012 (comparable #10). (Ptf's Ex 1 at 101.) Both of those duplexes had two 2 bedroom, 1 bath units and sold for $20.51 per square foot and $68.01 per square foot, respectively. (*Id*.) St. Clair determined that the average overall price was $88,391, or $46.07 per square foot, and then concluded that the smaller of Plaintiff's two types of duplexes had a range of value of between $68,000 and $78,000 and the larger type units had a value range of $89,000 to $99,000. (*Id*.)

Plaintiff's second approach was presented through the testimony and value report of Bean. Bean valued the 21 individual duplexes as an economic unit, treating those properties as an apartment complex. Bean prepared a broker's opinion of value based on an income analysis and a market analysis, which Bean gave equal weight. (Ptf's Ex 1 at 25.) Bean indicates in his report, and testified at trial, that he considered all three approaches but rejected the cost approach due to the age of the subject duplexes, which were built in 1979. (*Id*. at 23.)

Bean's report indicates that he used the direct capitalization method for his income approach, using the subject's actual income and expense history for all 21 duplexes, adjusting expenses by removing property taxes and mortgage payments and adding $250 per unit for replacement reserves. (Ptf's Ex 1 at 24.) Bean states in his report that his method is "the method preferred by commercial property investors." (*Id*.) Bean determined that the appropriate net operating income is $162,758 based on a four year average from 2009 through 2012. (*Id*. at 71.) Bean utilized a capitalization rate comprised of a "base cap rate of 8.25% [which] was taken from a combination of sales data, surveys, and literature," to which he added an effective tax rate of 1.5 percent. (*Id*. at 24.) That approach yielded an indicated value of $2,100,000. (*Id*.)

/ / /

Bean utilized a comparable sales approach to "verify the validity of [his] income analysis." (Ptf's Ex 1 at 24.) Bean's comparable sales approach was based on the premise that the subject should be viewed as an economic unit; therefore, his comparable sales are sales of apartment complexes. (Ptf's Ex 1 at 70; Testimony of Bean.) Bean analyzed the sale of 10 apartment complexes in Salem with 25 to 156 units and which sold at prices ranging from a low of $950,000 to a high of $6,507,131. (*Id.* at 70.) Those properties sold between October 1, 2010, and February 28, 2012. (*Id.*) The average sale price per unit was $43,312, or $58.26 per square foot. (*Id.*) Bean testified that multiplying his average comparable sale per unit of $43,312 by the subject's 42 units generated a value estimate of $1,819,104. (Ptf's Ex 1 at 70.) Bean derived a slightly higher value of $2,198,965 utilizing the average price per square foot. (*Id.*) Bean's apartment sales came from two reporting sources: LoopNet and Costar. (*Id.*)

Bean testified that he felt it was important to evaluate his comparable sales based on their net operating income's (NOI's). Bean's testimony was admittedly somewhat difficult to follow but his report includes information in two separate locations. (Ptf's Ex 1 at 25, 71.) Bean explains this approach in his report as follows:

> "NOI captures all factors that influence items of income and expense. The comparison was made on both a per unit and a per square foot basis. A ratio of subject NOI to the comparable sale NOI is determined. That ratio is then applied to the comparable sale price per unit or per square foot to obtain an indication of value for the subject. This is in effect equalizing the subject and the comparables on the basis of their earning power. The goal is the same whether the adjustments are made on a specific item basis or are based on an overall unit of comparison."

(*Id.* at 25.)

Bean adjusted his sales "[t]o more accurately compare the sales to the subject property," explaining that "the net operating incomes [of the sales] were compared." (*Id.* at 25.) Bean concluded that his apartment sales shared many of the same general characteristics as the subject

property, and he found a capitalization rate range of 6.75 percent to 9.8 percent, with a reported "upward trend 2011 and early 2012." (*Id*. at 24.) Utilizing that approach, Bean testified that he found an average indicated value per unit of $49,038, which when multiplied by the 42 individual units within the 21 duplex properties, produced and estimated value of $2,060,000 (rounded). Similar information appears in slightly more detail in Bean's value opinion summary report. (Ptf's Ex 1 at 25.)

Bean derived essentially four value estimates: $2,100,000 under the direct capitalization approach, which equates to $50,000 per unit; a value estimate of $1,819,104 under his "bracketed market data approach," and a slightly higher value estimate of $2,198,965 using his per unit market-based approach. (*Id*.) Finally, Bean's "NOI adjusted market approach" produces a value of $2,060,000. (*Id*.) Both Bean's value report and trial testimony conclude with a final reconciled opinion of value for the subject duplexes, viewed as an apartment, of $2,060,000 as of January 1, 2012. (*Id*. at 26.)

C.     *Defendant's evidence*

Defendant's appraiser Witters valued the subject property under the comparable sales approach and the income approach. (Def's Ex A at 3-6.) Witters identified the two different duplex types (which differ in size and bedroom/bathroom mix) as "Type A" and "Type B." (*Id*. at 3, 4.) Witters used four comparable sales for each duplex type; however, as he noted during his trial testimony, three of the four comparable sales are the same for both duplex types (comparables #2, #3, #4). (*Id*.) Witters noted that a correction needed to be made to his comparable sale #2 for both types of duplexes because he included closing costs in his report and felt that those costs should be removed. For the smaller "Type A" units, Witters made adjustments for changes in market conditions (a time adjustment), age, bathroom count, and size.

Also, Witters adjusted his comparable sale #4 for both duplex sizes by $4,000 for the lack of a garage.[7] His appraisal report indicates that he made an $8,000 negative adjustment, but Witters testified at trial that the adjustment should be $4,000, increasing the final adjusted sale prices of those two comparables by $4,000. (*See* Def's Ex A at 3, 4.)

Factoring in those adjustments, Witters arrived at an adjusted estimated value range for the smaller duplex units of $135,080 per duplex to $152,900 (factoring in the $4,000 increase, which adjusts the number reported in his report from $148,900), and a range of $145,040 to $192,420 for the larger duplexes. (*Id*. at 3, 4.[8])

Witters also utilized an income approach. (Def's Ex A at 6-7.) Witters looked at all sales of duplexes in the Willamette Multiple Listing Service (MLS) and selected four that he felt were most comparable to the subject duplexes. (*Id*. at 7; Testimony of Witters.) Based on average monthly rents for the two duplex types, Witters testified that a derived a yearly market lease rate of $15,240 for the smaller duplexes and $18,240 for the larger duplexes. (*Id*. at 6.) Witters then applied an average gross rent multiplier (GRM) of 9.08 to arrive at indicated real market values of $138,359 for the smaller duplexes and $165,595 for the larger duplexes. (*Id*.)

Witters indicated both in his valuation report and trial testimony that his value estimates under the comparable sales approach and the income approach supported the current roll values. Defendant is requesting that the court sustain the current real market values on the assessment and tax rolls.

///

---

[7] The adjustment for the garage is made to the comparable sale #4 on Witters' grid sheets for both the smaller and larger units because he used the same property for both duplex types (smaller and larger) in his analyses. (Def's Ex A at 3, 4.) The adjustment reduces the negative $8,000 adjustment to a negative $4,000 adjustment, which in turn increases the final adjusted sale price by $4,000.

[8] The $4,000 correction to comparable #4 on Defendant's larger duplex units (Def's Ex A at 4) increases the adjusted sale price from $158,860 to $162,860.

The real market values on the assessment and tax rolls for the subject duplexes are as follows:

The 11 smaller "mirror image" two bedroom, one bath duplexes are all on the rolls for a total real market value of $132,670.[9] (Def's Ex A at 2.) Of the remaining 10 larger mixed unit duplexes, seven of those properties have a total real market value on the rolls of $141,270.[10] The remaining three duplexes have real market values of $142,200, $142,900, and $143,120.[11] (*Id.*)

## III. ANALYSIS

A.  *Valuation law and burden of proof*

Except for exemptions and special assessments, real property in Oregon is assessed at the lesser of its RMV or its maximum assessed value. ORS 308.146(2); ORS 308.232. RMV is "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205(1).[12]

There are three approaches to valuation (income, cost, and sales comparison) that must be considered when determining the real market value of a property. *Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003); *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995); *see also* OAR 150-308.205-(A)(2)(a). By rule, RMV is to be determined "in all cases" by "methods and procedures in accordance with rules adopted by the Department of Revenue." ORS 308.205(2). The Department of Revenue has mandated the consideration of three approaches to real property

---

[9] The assessor account numbers are as follows: R92567, R92565, R92571, R92572, R92573, R92574, R92575, R92570, R92558, R92557, and R92555. (Def's Ex A at 2.)

[10] The account numbers for those properties are: R92569, R92568, R92564, 192563, R92561, R92560, and R92556. (Def's Ex A at 2.)

[11] The three account numbers for those higher value to duplexes are R92559, R92562, and R92566, respectively. (Def's Ex A at 2.)

[12] The court's references to the Oregon Revised Statutes (ORS) are to 2011.

valuation: the "sales comparison approach, cost approach, and income approach." OAR 150-308.205-(A)(2)(a). Not every approach will be applicable to every property. *Id.*; *see e.g. Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003). The valuation approach or approaches to be used is "a question of fact to be determined by the court upon the record." *Pacific Power & Light Co. v. Dept. of Revenue*, 286 Or 529, 533, 596 P2d 912 (1979).

By statute, Plaintiff has the burden of proof and must establish an error in the record assessment by a "preponderance" of the evidence. ORS 305.427. This court has previously ruled that a "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Schaefer v. Dept. of Rev.*, TC No 4530, WL 914208 *2 (July 12, 2001) (*citing Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971)); *see also Riley Hill General Contractor v. Tandy Corp.*, 303 Or 390, 394, 737 P2d 595 (1987) (where the Oregon Supreme Court explained that the derivation of the word "preponderance" is Latin in origin and "translates to 'outweigh, be of greater weight.' "). Evidence that is inconclusive or unpersuasive is insufficient to sustain the burden of proof. *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990).

This court has previously noted that the party bearing the burden of proof, who in this case is the plaintiff taxpayer, "must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.*, 18 OTR 324, 332 (2005) (*quoting Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002) (citation omitted). "Competent evidence includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents and licensed brokers." *Betz Evans Associates v. Lane County Assessor*, TC-MD 110329C, WL 4714961 at *3 (Oct 4, 2012); *Toy Box Maxi-Storage LLC v. Jackson County Assessor*, TC-MD No 110339C,

WL 1958943 at *3 (May 31, 2012); *Lebeck v. Multnomah County Assessor*, TC-MD No 100404D, WL 534207 at *1 (Feb 16, 2011).

In the final analysis, the value of property is ultimately a question of fact. *Chart Development Corp. v. Dept. of Rev.*, 16 OTR 9, 11 (2001) (citation omitted). And, by statute, "the court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

B.      *Court's evaluation of the evidence*

Plaintiff has two primary problems with meeting its burden of proof. First, Plaintiff's witness St. Clair presented comparable sales information that she obtained from other realtors in her office and perhaps from other offices, and also relied on the sales information from various reporting services including RMLS and LoopNet. St. Clair did not include in her written Opinion of Value, the independent data from the market, or include market based adjustments. Rather, St. Clair only submitted copies of the multiple listing service (MLS) data sheets for her comparable sales. St. Clair did not adequately address that issue at trial through her sworn testimony. And, rather than making adjustments to her comparable sales, St. Clair testified that she analyzed the data she had obtained and found a pattern, from which she eventually arrived at a value range for the two types of duplex properties here at issue.

Moreover, all of St. Clair's comparable sales are zoned RM or RS, RM being an abbreviation for multifamily residential (a zoning designation typically reserved for apartment complexes) and RS meaning residential, whereas the subject duplexes are zoned RD, which is residential duplex. The court was not persuaded by St. Clair's testimony that market participants are not concerned with zoning, especially when, on redirect, Plaintiff's representative presented

St. Clair with a hypothetical question about zoning, and St. Clair responded by testifying that a potential buyer might in fact be concerned about the zoning, testifying that a buyer's motivation and intent does matter. When pressed by Plaintiff's representative with another hypothetical, one involving a duplex located in an industrial zone, St. Clair testified that a potential buyer "might want to do due diligence to see if any known changes are coming."

Additionally, at least two of St. Clair's 11 comparable sales are "bank" sales (comparables #1, #3), and St. Clair testified that that factor has "no effect on value" because, according to St. Clair, banks are interested in getting the most money they can when selling a property, because banks have, in the past, lost money selling properties they had acquired through foreclosure or otherwise, and those institutions are now trying to recover from those losses by maximizing the sale prices of properties they acquire either through foreclosure or some form of conveyance by the former owner who could no longer make the mortgage payments. No market evidence was offered to corroborate that testimony.

According to Witters, two of the comparables were "bank owned," a third was a "Fannie Mae" sale, and several others were short sales. Plaintiff's representative objected to that testimony as lacking in foundation, and Witters acknowledged that he did not have the supporting documentation to substantiate that testimony, so the court accords Witters' testimony concerning the conditions of sale little weight, but is also cognizant of the fact that Plaintiff did not attempt to refute Witters' testimony with that of his own witnesses. Adding to the problem was the fact that St. Clair was not able to respond to Norris's question on re-cross regarding how many days the two banks sales were on the market, St. Clair simply stating that she did not know.

/ / /

The number of days a property is on the market (referred to as days on the market, or DOM) is a relevant factor because a quick sale *could* indicate that the seller had priced, or at least sold, the property at less than market value; in other words, the seller opted for a quick sale rather than holding out for a higher price. In the court's experience listing information typically includes days on the market, and the fact that St. Clair's listing information for her comparable sales does not include that information is troubling to the court.

Another problem with St. Clair's comparable sales, one which the court finds quite significant, is that five of her 11 comparable duplex sales were built between the 1942 and 1965 and St. Clair testified that she did not make any specific, individual adjustments to her comparables for differences between those properties and the subject duplexes, choosing instead to rely on "patterns" she found between the two types of properties (smaller versus larger duplexes) and then determining value ranges for the two types of duplexes. St. Clair's value range for the first "type" of property is $68,000 to $78,000; her range for the second "type" is $89,000 to $99,000. (Ptf's Ex 1 at 101.) St. Clair did testify that, in her opinion, the subject duplexes were "in the middle." Nonetheless, no specific value was presented by St. Clair. A $10,000 range is, in the court's opinion, rather substantial when the value range is $68,000 to $78,000. As indicated above, the current real market values on the assessment and tax rolls are between $132,670 and $143,120.

Plaintiff's second problem is that his other valuation witness Bean concluded that because the subject duplexes are located in a cluster and owned by a single individual, there were economies of scale that justified valuing each of the 21 individual duplexes, all of which sit on a separate tax lot and can be sold individually, based on market data for apartment complexes, plus an income approach based on the subject's income (as opposed to market derived income data).

Bean further compounded the problem he has with that approach by presenting effective gross income (EGI) rather than potential gross income (PGI) as his starting point, the latter (PGI) being the accepted starting point for property valuation under the income approach. The court may, in the right circumstances, find Bean's overall premise (valuing the 21 separate duplexes as if they were an apartment complex) to be an appropriate method to use in valuing individual duplexes, but persuasive reliable market data would have to be presented and explained. In this case Bean would have had to present reliable market evidence showing that a hypothetical buyer of one of the 21 individual duplexes at issue in this case would base the purchase price of that property on income or value data from apartment complexes. This is so because, as Defendant noted repeatedly during the presentation of its case-in-chief, in cross-examining Plaintiff's witnesses, and in both its opening and closing statements, each of the 21 duplexes sits on a separate tax lot, and is capable of being sold individually.

Thus, unlike an apartment building, with multiple residential living units in one or more buildings, in this case there are 21 individual properties, any one of which can be sold on a standalone basis. Therefore, while Bean's valuation methodology may be *theoretically* appropriate in this case, the court is more persuaded by Defendant's argument that Plaintiff is free to sell any of the 21 individual duplexes by itself and that the pool of potential buyers for such a property would base their decision on how much to pay for any of the subject properties (*i.e.*, market value) on market data from the sales of similar *duplexes* in a comparable location. Additional support for the court's conclusion in this case comes from Bean's value opinion summary report, which indicates in the highest and best use discussion of that report, "the existing development adds value to the site as if vacant, dictating a continuation of its current use. Thus, it is my opinion that the Highest and Best Use of the subject property as improved is a

low density multi-family development *as it is currently improved*." (Ptf's Ex 1 at 23 (emphasis added).)

Bean struck the court as the more knowledgeable and prepared of the trial witnesses, but his value approach lacks merit in this case and, in the end, Plaintiff failed to persuade the court, by a preponderance of the evidence, that the current roll values are in error.

There are, to be certain, problems with Witters' appraisal report, as well as his apparent overall knowledge and competency, as was revealed by Plaintiff's cross-examination of Witters. For example, Witters was unable to render an opinion of whether a zoning of RD was more or less valuable than an RM zoning. He further acknowledged on cross-examination that he chose comparable sales of duplexes in South Salem that are in a better location, and in justifying that choice, Witters testified that "location does not really affect value," or words to that effect. He later acknowledged that he made no location adjustments and that much of his opinion of value was based on neighborhood classifications done by other appraisers in the assessor's office some six years ago. That effort resulted in five classifications: excellent, good, average, fair, and poor.

Witters testified that all of his comparable sales are "urban residential." Given the compelling testimony by Plaintiff's witnesses as to the distinctly undesirable location for the subject duplexes, Witters' reliance on sales throughout the city based simply on the fact that they were classified as being areas similar to the subject is troubling to the court. Witters further testified that he had never seen the neighborhood study and had not brought it with him to trial. In an effort to rehabilitate himself, Witters testified that he was "familiar" with Salem. To be fair, Plaintiff's first valuation witness St. Clair took a similar position during her direct testimony, stating that she had lived in Salem for many years, raised her children in Salem, and that she too was "familiar" with Salem. St. Clair's testimony about her familiarity with Salem

was more detailed and persuasive than the Witters' general statement of his familiarity with the city.

At another point during cross-examination, Witters was asked whether someone would rent a one-bedroom unit for the same amount of money as a two-bedroom unit, a question aimed at his comparable sale #1, and Witters responded that he did not know. The court found that testimony striking for its lack of either knowledge or credibility (meaning that Witters either actually had no knowledge of whether a person would rent a two-bedroom unit for more than a one-bedroom unit, or that he was simply unwilling to acknowledge the obvious--that a two-bedroom unit would indeed rent for more than a one-bedroom unit). Witters also relied on land studies and ratio studies that he had not personally prepared or brought with him to trial.

In addition, Witters used a gross rent multiplier for his income approach but testified on cross examination that he was not familiar with investors who use such an approach. Also, five of Witters' eight sales used in his comparable sales approach consisted of two bank sales (comparable sale #3 in Defendant's sales approach for both duplex sizes), one sale of a property bought by a nonprofit organization (Defendant's comparable #1 for the larger duplex size), and Defendant's comparable #4, used for both the smaller and larger duplexes, involved a transaction between related parties. Thus, none of those sales can be viewed by the court as reliable evidence of value. The court could continue to chronicle the many problems it found with Witters' appraisal, but any such effort would add little to the outcome of the case because Plaintiff did not meet its statutory burden of proof and the problems with Defendant's valuation evidence that have been discussed by the court above are sufficient to explain why the court must simply sustain the values currently on the assessment and tax rolls. In other words, while the court has the statutory authority to determine the value of the property irrespective of the values pled by

the parties, based on the evidence presented, there is insufficient evidence for the court to determine any values different from those currently on the rolls.

IV.  CONCLUSION

After a detailed evaluation of the evidence and testimony at trial, the court concludes that Plaintiff has failed to establish an error in the real market values of the 21 duplexes under appeal by a preponderance of the evidence.  Moreover, there is insufficient evidence in the record for the court to determine the real market value as different than the values currently on the rolls under the authority given it by the legislature and codified in ORS 305.412.  Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied and the real market values for the 21 duplexes under appeal for the 2012-13 tax year are hereby sustained.

Dated this ___ day of January 2014.

_____
DAN ROBINSON
MAGISTRATE

*If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed.*

*This document was signed by Magistrate Dan Robinson on January 24, 2014. The Court filed and entered this document on January 24, 2014.*